UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
JONATHAN BOUSSANA,                                        :
                                    Plaintiff,            :
                                                          :            14 Civ. 3757 (LGS)
                       -against-                          :
                                                          :            OPINION & ORDER
SECRETARY JEH JOHNSON, et al.,                            :
                                    Defendants.           :
                                                          :
---------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_  6/11/15

LORNA G. SCHOFIELD, District Judge:

        Plaintiff Jonathan Boussana, a citizen of the Republic of Congo, entered the United States

in 2001, applied for asylum the same year, and was granted asylum in 2005.  Two years later, in

2007, he timely filed an application with the United States Citizenship and Immigration Services

("USCIS"), an agency under the Department of Homeland Security ("DHS"), for adjustment of

status to that of a lawful permanent resident – more commonly known as a "green card."  His

application remains pending.  Plaintiff alleges a violation of the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 et seq., and seeks a writ of mandamus compelling USCIS to render a

decision on the ground that Defendants have unreasonably delayed adjudication of his green card

application.  Defendants – Secretary of the DHS and the Director of the USCIS Texas Service

Center, where Plaintiff's green card application was filed – move to dismiss for failure to state a

claim or in the alternative for summary judgment because there has been no unreasonable delay.

For the reasons that follow, Defendants' motion to dismiss is granted in part, and the motion for

summary judgment is denied.

## I.  BACKGROUND

The following facts are taken from the operative Complaint, the documents attached or integral to it, and the parties' submissions – including sworn affidavits and exhibits – filed in connection with the present motion.  Unless otherwise noted, the facts are undisputed.

### A. Present Case

Plaintiff entered the United States on May 5, 2001, under the Visa Waiver Pilot Program[1] using a fraudulent passport.  He applied for asylum on September 19, 2001, and filed an amended application on November 10, 2004.  An Immigration Judge granted Plaintiff's asylum application on October 7, 2005.

An asylee may apply for a green card after one year in the United States by filing Form I-485 with USCIS.  Plaintiff filed his Form I-485 with the Texas Service Center on July 26, 2007.  Despite Plaintiff's repeated inquiries regarding the status of his application, the application remains pending almost eight years later.  Plaintiff initiated this action on May 27, 2014, seeking an order "requiring Defendants to adjudicate [his] application for adjustment of status."

### B. MCDDI

In his asylum applications and his affidavit in opposition to Defendants' motion, Plaintiff explains that he joined the Congolese Movement for Democracy and Integrated Development (*Mouvement Congolais pour la Démocratie et le Développement Intégral* or the "MCDDI") in 1992 as a student at the Marien Ngouabi University in Brazzaville, the capital of the Republic of Congo.  The MCDDI was founded by Bernard Kolelas as an opposition political party in the Republic of Congo in 1989.[2]  After Kolelas and his party lost the 1992 presidential elections, the

---

[1]     For details regarding the program's current incarnation, see U.S. Dep't of State, Visa Waiver Program, http://travel.state.gov/content/visas/english/visit/visa-waiver-program.html (last visited June 11, 2015).

[2]     *See* Mouvement Congolais pour la Démocratie et le Développement Intégral,

MCDDI organized protests against the government, and formed the "Ninja" militia force, which according to U.S. government records, engaged in violence – including hostage-taking, torture and extrajudicial killings – against the Congolese government's security forces and rival militia throughout the 1990s.[3]  During the civil war in the Republic of Congo that raged from 1997 into 1999, the MCDDI's Ninja militia reportedly killed hundreds, possibly thousands, of unarmed civilians at checkpoints in the areas under their control, executed government security forces and officials, tortured and killed journalists, raped women and looted homes and government buildings.

Plaintiff stated in his asylum application that upon joining the MCDDI in 1992, he was responsible for recruiting "youths within the university" to the MCDDI's various "cells" by explaining the "objectives of the party."  Because of his popularity, he was later appointed "propaganda coordinator" for his borough and tasked with setting up an "embassy" and promoting the MCDDI's agenda in advance of the 1992 elections.  In his affidavit in opposition to the present motion, Plaintiff explains that once he found out that the MCDDI like other political parties in the Republic of Congo had "raised a militia outfit" during the "1993/94 civil war," he along with a like-minded friend "expressed [his] dissatisfaction about the militia" to the local MCDDI chairman and told the chairman that he would sever his ties to the party.  The chairman advised Plaintiff and his friend to keep their views private for their own safety, but "[f]rom that moment, [Plaintiff] stopped attending party meetings and activities."  While Plaintiff did not send his formal resignation letter to the MCDDI until 2005, after he was granted asylum, he explains that his "affiliation with the MCDDI was never connected to any terrorist activities"

---

http://www.mcddi-cg.com/ (last visited June 11, 2015).

[3]        Details regarding the MCDDI are taken from USCIS, *Republic of Congo (Brazzaville): Information on the human rights situation and the Ninja militia*, (November 14, 2000), *available at*, http://www.refworld.org/docid/3dedffab4.html (last visited June 11, 2015).

and he entered the party to "promote democratic ideals."  Plaintiff states that he was never a

member of the Ninja militia and "never endorsed the idea of militancy for promotion of

democratic ideals."  In fact, Plaintiff's asylum claim was based in part on the fact that from 1997

to 1998, the government in the Republic of Congo – which backed a different home-grown

militia – had falsely accused him of being a Ninja militant because he "was the right age and

ethnicity," and then imprisoned and tortured him.

Plaintiff also submits an affidavit in French from Mounkassa Bertin, who severed ties

with the MDCCI at the same time as Plaintiff.[4]  Mr. Bertin states that he and Plaintiff "used to be

members" of the MCDDI.  They "took part [in the] electoral c[a]mpaign for Bernard Kolelas,"

the MCDDI's candidate "for presidential election."  Mr. Bertin then states that "[d]uring the war,

we were wanted by the [C]obras – President Denis Sassou Ngueso's militia – for campaigning for

Bernard Kolelas.  So we ended up in jail, where we were molested."  According to Mr. Bertin,

"when they got out of prison," he and Plaintiff "realized that the MCDDI created an armed

militia," and Plaintiff and Mr. Bertin "immediately stopped attending the party's activities."  Mr.

Bertin does not specify whether the war during which he claims he was imprisoned along with

Plaintiff was (1) the "1993/94 civil war," which followed the 1992 presidential election, or (2) the

1997/1998 conflict, during which Plaintiff states he was imprisoned.  In his asylum applications,

Plaintiff states that he was arrested in 1997 and again in 1999; he has never stated that he was

imprisoned during the earlier "1993/94 civil war."

Plaintiff submits that he is injured by the eight-year delay in the adjudication of his green

card application because, as an asylee, he can travel internationally only on a "refugee passport,"

which is "valid for a period of 1 year," and so must be renewed annually.  He states that the cost

---

[4]     The quotations from Mr. Bertin's affidavit are from the certified translation Plaintiff
submitted.

of renewing the refugee passport "is over $450.00" and is "financially unsustainable to him."  He also complains that Defendants' delay in adjudication has robbed him of his "peace of mind" to which he is entitled.

### C. Legal Framework

In addition to being otherwise "admissible" in the United States, asylees wishing to obtain a green card must meet various other conditions including establishing physical presence in the United States for at least one year prior to applying for the green card.  8 U.S.C. §§ 1159(b), 1182.

Defendants submit that 8 U.S.C. § 1182(a)(3)(B) is a statutory bar to Plaintiff's change of status.  That provision makes aliens who have provided material support to or solicited members for a terrorist organization inadmissible for immigration purposes.  As amended by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, the Immigration and Nationality Act ("INA") establishes three types of terrorist organizations, of which only the third type – called "Tier III" terrorist organizations – is relevant here.  A Tier III organization is a group that "engages in, or has a subgroup which engages in" terrorist activities.  *Id.* § 1182(a)(3)(B)(vi)(III).  The statute defines terrorist activities broadly to include the use of "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  *Id.* § 1182(a)(3)(B)(iii)(V)(b).  An individual who "solicit[s] any individual [] for membership" in or "affords material support" to Tier III terrorist organizations is inadmissible under the INA unless he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization."  *Id.* §§ 1182(a)(3)(B)(iv)(V)(cc), (VI)(dd).

In an affidavit in support of Defendant's motion, a Supervisor at USCIS' Texas Service Center states that the MCDDI meets the definition of a Tier III organization because its subgroup, the Ninja militia, engaged in terrorist activity as defined by the REAL ID Act.  She further states that because Plaintiff provided material support to and solicited members for the MCDDI, he is inadmissible under the INA and accordingly ineligible for a green card.  Finally, the affidavit advises that if compelled to adjudicate Plaintiff's application, USCIS would likely deny it without prejudice to refiling.

In the Consolidated Appropriations Act of 2008 (the "CAA"), Pub. L. No. 110-161, 121 Stat. 1844, 2364-65, Congress gave both the Secretary of State and the Secretary of Homeland Security, "after consultation with the Attorney General" and each other, the authority to "determine in such Secretary's sole unreviewable discretion" whether the statutory bar applies to a particular Tier III group.  8 U.S.C. § 1182(d)(3)(B)(i).

According to Defendants, "Plaintiff's application for adjustment of status has been placed on adjudicative hold pursuant to USCIS policy because Plaintiff has admitted to engaging in activity that renders him inadmissible[.]"  The origin of USCIS' policy of holding Plaintiff's application instead of denying (or granting) it can be traced to a March 2008 memorandum from the USCIS' deputy director issued in response to the CAA's grant of discretionary authority.  The memorandum advised that "until further notice adjudicators are to withhold adjudication of cases in which the only ground(s) for . . . denial is a terrorist-related inadmissibility provision[]" and the applicant is "inadmissible under the terrorist-related provisions of the INA based on any activity or association that was not under duress relating to any . . . Tier III organization [not specifically named in the CAA]."  In July 2008 and again in February 2009, USCIS put out additional guidance but did not lift the adjudication hold on cases such as Plaintiff's.  Instead, the

agency renewed the requirement that cases involving "[a]pplicants who are inadmissible under the terrorist-related provisions of the INA based on any activity or association that was not under duress relating to any Tier III organization, other than those for which an exemption currently exists," be placed on hold.

Although several exemptions have been issued to date, Defendants submit that none benefit Plaintiff in relation to his activities on behalf of the MCDDI.  Because of the requirements and complexities of multi-agency coordination, most of the exemptions have been tied to organizations and few have been granted on an individual case-by-case basis.  Since June 2010, USCIS has released over 3,500 cases from hold based on updated country conditions and determinations that "an organization did not meet the Tier III definition prior to a certain date or ceased to fall within the Tier III definition after a particular point in time."  Defendants state that they are continuing to keep Plaintiff's application on adjudicatory hold to allow consideration of any future discretionary exemptions that may apply.

In her affidavit, the Supervisor at the Texas Service Center explains that the various background checks that are necessary to adjudicate Plaintiff's green card application, including fingerprint checks and name checks conducted by the FBI, either have been completed or can be completed quickly and kept current "to ensure that the case is ready to be adjudicated once all other issues are resolved."

## II.  LEGAL STANDARD

On a motion to dismiss, a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party.  *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 284 (2d Cir. 2013).  To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Federal Rule of Civil Procedure 8 "requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

Where a motion to dismiss presents matters outside of the pleadings, the court may consider them but only by converting the motion into one for summary judgment under Federal Rule of Civil Procedure 56.  Fed. R. Civ. P. 12(d).  To do so, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*; *see Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 67-68 (2d Cir. 2014) (affirming a district court's conversion of a motion to dismiss into a motion for summary judgment where the opposing party was given sufficient notice and an opportunity to respond).  Formal notice is not required ordinarily where a party "should have reasonably recognized the possibility" of such conversion.  *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (alteration in original) (citation and internal quotation marks omitted).

Summary judgment is appropriate where the record before the court establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving

party's favor.  *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *see*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. DISCUSSION

Plaintiff seeks relief under the Mandamus Act and the APA in the form of an order

compelling USCIS to adjudicate his green card application.  Defendants move to dismiss for

failure to state a claim, or in the alternative, for summary judgment because any delay in

processing Plaintiff's green card application has not been unreasonable as a matter of law.

Defendants' motion to dismiss is granted as to Plaintiff's mandamus claim, and otherwise denied.

The motion for summary judgment is denied.

### A. Subject-Matter Jurisdiction

Before reaching the merits, the Court must be satisfied of the existence of subject matter

jurisdiction even though neither party has raised the issue.  *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546

U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-

matter jurisdiction exists, even in the absence of a challenge from any party.").  For the following

reasons, subject matter jurisdiction exists.

"[D]istrict courts . . . have original jurisdiction of any action in the nature of mandamus to

compel an officer or employee of the U.S. or any agency thereof to perform a duty owed to the

plaintiff."  28 U.S.C. § 1361.  Under the APA, agencies like USCIS have a duty to conclude

matters presented to them within a "reasonable time," 5 U.S.C. § 555(b), and a court may

"compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

However, in the immigration context, the INA provides in relevant part that "no court shall have

jurisdiction to review . . . any judgment regarding the granting of relief," inter alia, of the kind

Plaintiff seeks, or "any other decision or action of the Attorney General or the Secretary of

[DHS], the authority for which is" solely in their discretion under the INA.  8 U.S.C. §

1252(a)(2)(B) ("Section 1252").

   Courts in this District and across the country are split as to "whether the Mandamus Act

and/or the APA afford subject matter jurisdiction over claims that USCIS failed to adjudicate, or

is unreasonably delayed in adjudicating, a Form I-485." *Labaneya v. U.S. Citizenship &*

*Immigration Servs.*, 965 F. Supp. 2d 823, 827 (E.D. Mich. 2013) (collecting cases);

*Nigmadzhanov v. Mueller*, 550 F. Supp. 2d 540, 544 (S.D.N.Y. 2008) (collecting cases showing

division in this District).  The threshold question is whether Section 1252 divests jurisdiction over

the present suit.  Although some courts have held that the Section 1252 of the INA "stripped

[them] of jurisdiction to review the status of unadjudicated adjustment applications," *Geneme v.*

*Holder*, 935 F. Supp. 2d 184, 190 (D.D.C. 2013) (collecting cases), "the overwhelming majority

of district courts" have held otherwise, *Hassane v. Holder*, No. C10-314Z, 2010 WL 2425993, at

*3 (W.D. Wash. June 11, 2010).  For the reasons that follow, the Court adopts the latter view.

   By its plain terms, Section 1252 divests jurisdiction to review "judgment[s] regarding the

*granting* of relief" and any decision of the Attorney General or Secretary of the DHS that the INA

reserves to their exclusive discretion.  *See* 8 U.S.C. § 1252(a)(2)(B).  The Second Circuit,

quoting approvingly the Seventh Circuit, has explained that Section 1252 precludes review "only

of 'a judgment denying a request for adjustment of status.'"  *Sharkey v. Quarantillo*, 541 F.3d 75,

85 (2d Cir. 2008) (quoting *Subhan v. Ashcroft*, 383 F.3d 591, 594 (7th Cir. 2004)).  Because "no

statutory provision in the relevant subchapters [of the INA] expressly gives the government the

power not to adjudicate an adjustment of status application," Defendants' decision to place

Plaintiff's application on adjudicatory hold is not insulated from judicial review.  *Nigmadzhanov*,

550 F. Supp. 2d at 547; *see also Ruiz v. Mukasey*, 552 F.3d 269, 275 (2d Cir. 2009) (Under

Section 1252, "the important question is whether the text of the subchapter in which the relevant provisions appear 'specifies' that the 'decision' is 'in the discretion of the Attorney General.'" (internal quotation marks and alterations omitted)).

Although the Second Circuit has not addressed the precise question at issue here – whether federal courts have jurisdiction to consider challenges to unadjudicated green card applications[5] – its reasoning in *Sharkey v. Quarantillo* confirms that Section 1252 does not divest jurisdiction over such suits.  In *Sharkey*, the plaintiff sought an order from the district court declaring that USCIS had unlawfully rescinded her green card.  541 F.3d at 81.  The threshold inquiry was "whether Section 1252[] strips the district court of jurisdiction to determine *whether* Sharkey's status [had been] adjusted to that of [a lawful permanent resident]" in the past.  *Id.* at 85.  The Second Circuit concluded that "the Section 1252[ jurisdictional] bar does not apply" because "[i]n the course of [its] inquiry, the district court will not subject to judicial review any discretionary decision by the agency."  *Id.*  Similarly, here, because Plaintiff does not seek judicial review of any discretionary decision of USCIS, Section 1252 does not act as a jurisdictional bar.

Limiting Section 1252 to its plain terms is also consistent "with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Kucana v. Holder*, 558 U.S. 233, 251 (2010).  The Supreme Court has "consistently applied that interpretive guide to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction."  *Id.*  (collecting cases).

---

[5]     "[T]he two federal appellate courts that have addressed the issue have not created any consensus."  *Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) (citing *Debba v. Heinauer*, 366 F. App'x. 696 (8th Cir. 2010), and *Bian v. Clinton*, 605 F.3d 249, 255 (5th Cir. 2010), *vacated as moot*, 2010 WL 3633770 (5th Cir. Sept. 16, 2010)).

Finally, 28 U.S.C. § 1331 supplies subject matter jurisdiction.  "[I]t is common ground that if review is proper under the APA, the District Court ha[s] jurisdiction under 28 USC § 1331."  *Bowen v. Massachusetts*, 487 U.S. 879, 891 n. 16 (1988).  "Whether to adjudicate an adjustment application is not discretionary, but governed by section 6 of the APA, requiring [US]CIS to take action on a matter presented to it 'within a reasonable time.'"  *Kim v. Ashcroft*, 340 F. Supp. 2d 384, 389 (S.D.N.Y. 2004).  "The duty to decide becomes no duty at all if it is accompanied by unchecked power to decide when to decide."  *Nigmadzhanov*, 550 F. Supp. at 547 (internal quotation marks omitted).  The APA thus "imposes [upon USCIS] a nondiscretionary duty to adjudicate within a reasonable time" that is enforceable by federal courts.  *Id.*  Because review is proper under the APA, subject matter jurisdiction exists.  *See also In re Natural Res. Def. Council*, 645 F.3d 400, 406 (D.C. Cir. 2011) ("[I]n cases brought under APA § 706(1) seeking to 'compel agency action unlawfully withheld or unreasonably delayed,' [] when the agency has failed to act within a 'reasonable time,' [] jurisdiction lies in the district court.").

In sum, the Court has subject matter jurisdiction under federal question jurisdiction, and Section 1252 does not bar jurisdiction over the present suit.

**B. Failure to State A Claim**

On the merits, Defendants' motion to dismiss the Complaint for failure to state a claim is granted as to Plaintiff's mandamus claim, but is otherwise denied.

As an initial matter, Defendants misapprehend the nature of the present action.  Arguing that under the APA, courts may not review agency action committed to the agency's discretion, *see* 5 U.S.C. § 701(a)(2), Defendants frame the Complaint as seeking review of a discretionary decision regarding whether any exemption to Plaintiff's inadmissibility applies.  (Br. 13).  That is

not what Plaintiff seeks.  After eight years, Plaintiff seeks a decision – a grant or denial – of his green card application.  That relief is cognizable under the APA, which permits a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

As explained above, the INA does not shield from judicial review USCIS' non-adjudicatory decision to place Plaintiff's application on hold.  Only the Secretary's grant or denial of discretionary relief cannot be judicially reviewed.  *See, e.g.*, *Nigmadzhanov*, 550 F. Supp. 2d at 546 ("Of course, the Attorney General has unfettered (and hence, unreviewable) discretion whether to *grant or deny* an application.").  USCIS may ultimately deny Plaintiff's application, but it has a duty "within a reasonable time . . . to conclude a matter presented to it."  5 U.S.C. § 555(b); *see, e.g.*, *Al-Rifahe v. Mayorkas*, 776 F. Supp. 2d 927, 933 (D. Minn. 2011) ("[W]hile the ultimate decision to grant or deny an application for adjustment of status is unquestionably discretionary, there exists a non-discretionary duty to act on and process the application.").  The Complaint sufficiently alleges that USCIS has unreasonably delayed adjudicating Plaintiff's green card application.  Accordingly, the Complaint states a claim for relief under the APA, and Defendants' motion to dismiss Plaintiff's APA claim is denied.

However, any mandamus claims is dismissed.  Mandamus is a "drastic and extraordinary remedy" that is "reserved for really extraordinary causes."  *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (internal quotation marks omitted).  Three conditions must be established before a writ of mandamus may issue:

> (1) the party seeking issuance of the writ must have no other adequate means to attain the relief it desires; (2) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances; and (3) the petitioner must demonstrate that the right to issuance of the writ is clear and indisputable.

*In re The City of New York*, 607 F.3d 923, 932-33 (2d Cir. 2010) (internal quotation marks and alterations omitted).  Plaintiff's APA claim – which is duplicative of his mandamus claim – survives the motion to dismiss.  Accordingly, Plaintiff has "other adequate means to attain the relief he desires."  Because Plaintiff cannot meet the first requirement for a writ mandamus, Defendants' motion to dismiss the mandamus claim is granted.  *See Sharkey*, 541 F.3d at 93 (dismissing mandamus claims as duplicative when APA claims withstand dismissal).

### C. Unreasonable Delay

Defendants argue that they are entitled to summary judgment because "the undisputed facts demonstrate that the Government has neither unlawfully withheld nor unreasonably delayed agency action."[6]  To the contrary, the undisputed facts demonstrate that the eight-year delay in adjudicating Plaintiff's green card application has been unreasonable.

The Second Circuit has stated that "[i]n determining reasonableness, [courts] look to the source of delay – *e.g.*, the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding."  *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 120 (2d Cir. 1999).  Some courts in this District have refined the analysis by applying a six-factor test articulated by the District of Columbia Circuit in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*").  *See, e.g.*, *Natural Res. Def. Council, Inc., v. U.S. Food & Drug Admin.*, 884 F. Supp.

---

[6]      In light of Defendants' representation that the necessary background checks have been completed and Plaintiff's fingerprint data is kept current, "[i]t is . . . reasonable to question whether [Plaintiff's] APA claim ought not be analyzed to determine whether USCIS has 'improperly withheld' agency action, in derogation of its nondiscretionary obligation to adjudicate I-485 applications, as a disjunctive ground for relief under the APA," rather than analyzing "unreasonable delay."  *Hosseini v. Napolitano*, 12 F. Supp. 3d 1027, 1034 (E.D. Ky. 2014) (collecting cases).  However, because both parties focus solely on the question of "unreasonable delay" – as have other courts confronted with similar cases – this Opinion addresses only that question.

2d 108, 118 (S.D.N.Y. 2012); *Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540

(S.D.N.Y. 2009).

> The six factors are:
>
> (1) the time agencies take to make decisions must be governed by a rule of
> reason; (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might
> be reasonable in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the effect of
> expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not find any impropriety lurking
> behind agency lassitude in order to hold that agency action is unreasonably
> delayed.

*TRAC*, 750 F.2d at 80.  An analysis of these factors compels the conclusion that the eight-year

delay in adjudicating Plaintiff's green card application has been unreasonable as a matter of law.

In cases like the present one, where Congress has not specified a fixed timetable for

agency action, "[u]nder the first and second factors, . . . courts focus, in part, on the

reasonableness of the delay, giving due consideration to the complexities added by the

implication of terrorism-related grounds for inadmissibility."  *Hosseini v. Napolitano*, 12 F. Supp.

3d 1027, 1035 (E.D. Ky. 2014).  Although "courts have generally found delays of four years or

less not to be unreasonable[,] . . . many courts applying the *TRAC* factors have declined to find

that delays exceeding six years are reasonable."  *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071-72

(N.D. Cal. 2014) (collecting cases) (internal citations omitted).  While "the government's time-

consuming exemption process requires careful deliberation and the coordination of numerous

agencies," after eight years "the seemingly indefinite delay of an I-485 petition becomes

untethered from any discernable 'rule of reason.'"  *Id.* at 1072 (internal quotation marks and

citation omitted) (declining to find five and one-half year delay in adjudicating terror-related green card application reasonable).

Courts generally analyze the third and fifth factors together. *See, e.g.*, *Geneme*, 935 F. Supp. 2d at 194. "[D]elays that might be reasonable in the sphere of economic regulation are less tolerable" when Plaintiff's welfare is at stake, and so the "nature and extent of [Plaintiff's] interests" that have been "prejudiced by the delay" must be considered. *TRAC*, 750 F.2d at 80. "There is little question that, to some extent, [Plaintiff's] welfare is at stake while he continues to sit in limbo, precluded from pursuing lawful permanent resident status." *Islam*, 32 F. Supp. 3d at 1073. In addition, Plaintiff's travel restrictions further support weighing the third and fifth factors in his favor. In urging a contrary conclusion, Defendants argue that Plaintiff's "inconvenience" caused by any delay in adjudication "is outweighed by Defendants' interest in national security." As courts have repeatedly found, however, "a generalized concern over national security does not provide sufficient justification to hold [Plaintiff's] Application indefinitely." *Qureshi v. Napolitano*, No. C-11-05814, 2012 WL 2503828, at *6 (N.D. Cal. June 28, 2012); *see, e.g.*, *Ahmed v. Holder*, 12 F. Supp. 3d 747, 760 (E.D. Pa. 2014) ("The fact that the government has not instigated deportation proceedings against Ahmed undercuts its arguments regarding national security concerns, given that providing material support to a terrorist organization is a removable offense.").

As to the fourth factor, contrary to Defendants' assertion, an order compelling adjudication of Plaintiff's green card application would constitute at most a minimal intrusion on the agency's activities. USCIS has already determined that Plaintiff does not qualify for an exemption; they may readily formalize that decision by denying Plaintiff's application. *See, e.g.*, *Al-Rifahe v. Mayorkas*, 776 F. Supp. 2d 927, 937 (D. Minn. 2011) ("Defendants provide no

reason why plaintiff's application cannot be adjudicated immediately, subject to future re-opening and review when and if USCIS policies regarding [the Tier III organization] change.").[7] Further, "[a]djudicating [Plaintiff's] application would not substantially interfere with the government's consideration of the broader issue of whether to issue a blanket exemption to supporters of the [MCDDI]." *Geneme*, 935 F. Supp. 2d at 194-95.

Finally, there has been no suggestion of agency impropriety, but "the court need not find any . . . in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80.

In sum, Defendants are not entitled to summary judgment on the issue of unreasonable delay. Rather, the undisputed facts show that the adjudication of Plaintiff's green card application has been unreasonably delayed. Accordingly, Plaintiff is entitled to an order compelling USCIS to adjudicate his green card application.

---

[7]     Although the ultimate decision on Plaintiff's application is committed to USCIS' discretion, the record on this motion does not seem to support Defendants' view that Plaintiff is inadmissible for providing material support to and recruiting members for a Tier III terrorist organization. The issue of timing is key. As the Supervisor from Texas Service Center states in her affidavit in support of Defendants' motion, USCIS recognizes that "an organization [may] not meet the Tier III definition prior to a certain date or [may] cease[] to fall within the Tier III definition after a particular point in time." Here, the parties agree that the Ninja militia makes the MCDDI a Tier III organization because it is "a subgroup which engages in" terrorist activities. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). However, no date has been provided for when the Ninja militia came into being or when the Ninja militia first committed "terrorist activities" as defined by the INA. Defendants submit that the Ninja was founded after the 1992 elections "[i]n response to the government security forces' efforts to control [MCDDI's] demonstrations," which lasted through 1993. Plaintiff states that he first learned of the Ninja militia in "1993/94" and immediately dissociated himself from the party. To the extent Plaintiff's inadmissibility is premised on his "solicitation" of new members to or material support for a Tier III organization during the lead up to the 1992 elections, his activities predated the Ninja and cannot render Plaintiff inadmissible. The present record contains no evidence of material support or solicitation after the 1992 elections. Further, Plaintiff argues that he is not "inadmissible" because he "can demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." *Id.* § 1182(a)(3)(B)(iii)(VI)(dd). The record is silent as to whether Plaintiff was given a chance to demonstrate that the Tier III material-support bar does not apply to him.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss or in the alternative for summary judgment is adjudicated as follows:  (1) GRANTED regarding Plaintiff's claim under the Mandamus Act and (2) DENIED in all other regards.  Defendants are ORDERED to complete the adjudication of Plaintiff's application for adjustment of status to permanent resident by **July 27, 2015**.  By **August 10, 2015**, USCIS shall inform the court and Plaintiff of its decision.  The Court will retain jurisdiction over the matter during this interim period to ensure that USCIS complies with this Order.

The Clerk of Court is directed to close the motion at Dkt. No. 12.

SO ORDERED.

Dated: June 11, 2015
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE